### In re BUSPIRONE ANTITRUST LITIGATION.

#### MDL No. 1413.

United States District Court,
S.D. New York.

June 26, 2002.

Noah Silverman, Bruce E. Gerstein, Adam Steinfeld, Garwin, Bronzaft, Gerstein & Fisher, LLP, New York City, Richard B. Drubel, Kimberly Schultz, Boies, Schiller & Flexner, Hanover, NH, for Plaintiffs.

Evan Chesler, Elizabeth L. Grayer, Richard J. Stark, Cravath, Swaine & Moore, New York City, for Defendant Bristol–Myers Squibb, Inc.

### OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

The plaintiffs in these consolidated antitrust cases have made two motions: (1) for a ruling that defendant Bristol–Myers Squibb Company ("Bristol–Myers") has already waived its attorney-client privilege with respect to certain matters because it placed those matters "at issue" in this litigation and (2) to compel Bristol–Myers to elect whether it intends to assert "good faith" or "reliance on counsel" defenses to the claims asserted in the complaints.[1] For the reasons stated

---

1. The plaintiffs include "generic drug makers who seek to enter the buspirone market, direct purchasers of buspirone products, end-payors who have purchased buspirone, consumer protection organizations, or their representatives and thirty states." *In re Buspirone Patent Litigation*, 185 F.Supp.2d 363, 365–66 (S.D.N.Y.2002).

below, the first motion is denied and the second motion is granted.

## I. BACKGROUND

Plaintiffs have filed antitrust claims against Bristol–Myers alleging that it engaged in anti-competitive conduct by improperly extending its monopoly over buspirone hydrochloride ("buspirone"), an anti-anxiety drug sold under the brand name BuSpar. Bristol–Myers is alleged to have done so by fraudulently exploiting federal patent and drug laws and by colluding with a potential competitor through the settlement of a lawsuit. On August 15, 2001, the Judicial Panel on Multidistrict Litigation consolidated in this district three patent infringement suits brought by Bristol–Myers, another patent infringement suit brought by generic drug companies against Bristol–Myers, and twenty-two antitrust actions brought by various plaintiffs. On February 14, 2002, District Judge John G. Koeltl granted summary judgment against Bristol–Myers with respect to the patent infringement claims, *In re Buspirone Patent Litigation*, 185 F.Supp.2d 340 (S.D.N.Y.2002), and granted in part and denied in part Bristol–Myers's motion to dismiss the plaintiffs' antitrust and related state law claims, *In re Buspirone Patent Litigation*, 185 F.Supp.2d 363 (S.D.N.Y.2002). The facts that underlie the instant motion are fully set forth in those two decisions, familiarity with which is assumed.

### A. The Patent Infringement Claims

In brief, Bristol–Myers obtained a patent in 1980 (the "'763 patent") that covered, among other things, a method of treating anxiety in humans through a dose of the drug buspirone. *In re Buspirone Patent Litigation*, 185 F.Supp.2d 340, 342 (S.D.N.Y. 2002). In order to sell this new drug, Bristol–Myers, as a pioneer drug company, obtained approval of a New Drug Application ("NDA") from the Food and Drug Administration (the "FDA"). *See* 21 U.S.C. § 355. In 1986, Bristol–Myers began selling buspirone under the brand name BuSpar.

The '763 patent was due to expire on November 21, 2001. In anticipation of this date, manufacturers of generic drugs began preparations to sell a generic version of buspirone as soon as the patent expired. By virtue of the Hatch–Waxman Amendments, enacted in 1984, Pub.L. No. 98–417, 98 Stat. 1585, manufacturers may obtain expedited approval of generic versions of FDA-approved drugs by filing an Abbreviated New Drug Application ("ANDA"). 21 U.S.C. § 355(j). Two manufacturers filed such ANDAs seeking FDA approval of generic buspirone.

The Hatch–Waxman Amendments also provide that a pioneer drug company filing an NDA must include information on any patent that claims a drug or a method of using the drug and "with respect to which a claim of patent infringement could be reasonably asserted if a person not licensed by the owner engaged in the manufacture, use or sale of the drug." 21 U.S.C. § 355(b)(1). If a pioneer drug company obtains such a patent after the NDA has been filed or approved (as Bristol–Myers claimed to be true in this case when it obtained a new patent in 2000), the pioneer company is required to file supplemental information on the new patent within thirty days of the date the patent is issued. *See* 21 U.S.C. §§ 355(b)(1) & (c)(2). Upon receipt of the supplemental information, the FDA publishes the submitted patent information in the Approved Drug Products with Therapeutic Equivalence Evaluations book, commonly known as the "Orange Book." If an ANDA is pending at the time a new patent is listed in the Orange Book, the generic drug company must supplement its FDA submission to indicate that it may permissibly sell the generic version of the drug despite the patent claim. As occurred here, an applicant may certify that "the patent is invalid or will not be infringed by the manufacture, use or sale of the new drug for which the [ANDA has been] submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

By November 21, 2000, the FDA had granted tentative approval to two generic companies for their ANDAs, contingent only on the expiration of the '763 patent. One company had manufactured and was ready to ship buspirone the minute the '763 patent expired. 185 F.Supp.2d at 346. Hours before the '763 patent expired, however, Bris-

tol–Myers was awarded a new patent, "the '365 patent," that covered a metabolite referred to as the "6–hydroxy–metabolite" or "BMY 28674." 6–hydroxy–metabolite is a substance that the human body naturally produces when it metabolizes buspirone. 185 F.Supp.2d at 344. While the '365 patent did not cover a use of buspirone, *see id.* at 352, 355, 359, Bristol–Myers nonetheless applied to have the '365 patent listed in the Orange Book. The application was accompanied with a declaration from Bristol–Myers's patent counsel that the '365 patent was "a method of use patent covering, among other things, a method of using BuSpar for all of its approved indications ..." *See* Declaration of Richard P. Ryan, reproduced in Exhibit H to Plaintiffs' Motion to Compel Production of Documents and Testimony Pursuant to the Crime–Fraud Exception and Memorandum In Support Thereof, dated March 8, 2002 ("Pl. Crime–Fraud Mot."). In other words, Bristol–Myers asserted to the FDA that the '365 patent covered a method of using the drug buspirone when in fact it only covered the metabolite. *See* 185 F.Supp.2d at 376.

The effect of making this assertion (that is, of listing the patent in the Orange Book) was to suspend the generic companies' ANDAs for generic buspirone. The generic companies immediately submitted letters to the FDA pointing out (among other things) that the '365 patent covers only use of the metabolite and not the use of buspirone itself. The FDA thereupon wrote to Bristol–Myers emphasizing that:

> The accuracy and completeness of [the] description of the patent is important to the issue of whether the patent meets the statutory requirements for listing. If the '365 patent contains only the claim for the use of [the metabolite], and no separate claim for an approved use of the parent drug buspirone ..., FDA may not be able to list it in the Orange Book as a protection for BuSpar.

November 30, 2000 FDA letter, reproduced as Pl. Crime–Fraud Mot., Ex. G, at 1–2. Bristol–Myers's outside patent counsel responded by reiterating that "the '365 patent does not simply claim a method of using [the metabolite], but also claims a method of us-

ing buspirone ..." and "there can be no question that the '365 patent claims an approved use of buspirone ...." December 4, 2000 letter, reproduced in Exhibit H to Pl. Crime–Fraud Mot., at 2, 3. As already noted, the '365 patent in fact covered only the use of the metabolite and not the use of buspirone.

The generic companies filed certifications with the FDA stating that their proposed products did not infringe the '365 patent and provided Bristol–Myers with notice of these certifications. 185 F.Supp.2d at 350. The FDA was required to approve the ANDAs unless Bristol–Myers filed suit against the generic companies within forty-five days. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(2). Bristol–Myers did so. Under the Hatch–Waxman Amendments, the mere filing of these suits barred the FDA from approving the ANDAs for the generic companies for a period of 30 months (or until the court hearing the patent infringement suits rendered a decision). *See* 21 U.S.C. § 355(j)(5)(B)(iii).

### B. *The Antitrust Claims*

The antitrust plaintiffs allege that Bristol–Myers attempted to extend and/or extended an unlawful monopoly over the market in buspirone tablets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by abusing the statutory provisions that barred the FDA from approving the generic version of buspirone once Bristol–Myers listed the '365 Patent in the Orange Book. *See, e.g.,* Second Amended Complaint, filed April 8, 2002 ("Complaint") at 18–28. Specifically, the plaintiffs allege that Bristol–Myers made a bad faith attempt to interfere with the generic competitors' entry into the buspirone market by asserting to the FDA that the '365 patent covered the approved uses of buspirone when Bristol–Myers knew that these assertions were false. *See, e.g.,* Complaint, ¶¶ 89, 91. They also claim that Bristol–Myers pursued patent infringement suits— thereby obtaining an automatic stay of the FDA's approval of the generic version of buspirone, *see* 21 U.S.C. § 355(j)(5)(B)(iii)— with knowledge that the stay was obtained

by making false statements to the FDA. *See, e.g.,* Complaint at ¶ 125, 126.

In addition, some plaintiffs allege that Bristol–Myers acted unlawfully by settling a patent infringement suit with Danbury Pharmacal, Inc. and its affiliate Schein Pharmaceuticals, Inc. ("Schein") in 1994 on the ground that the settlement was a sham used to cover up an unlawful anticompetitive arrangement under which Schein agreed to stay out of the buspirone market and help maintain a public perception that the original '763 Patent was valid in return for $72.5 million, even though both parties knew that the '763 Patent was not valid. *See, e.g.,* Complaint at ¶¶ 40–47.[2]

## II. *"At Issue" Waiver Motion*

On February 14, 2002, the antitrust plaintiffs submitted a motion seeking the disclosure of otherwise attorney-client-privileged documents on the ground that Bristol–Myers had placed these matters "at issue" during the briefing on the summary judgment motion in the patent infringement suits. *See* Antitrust Plaintiffs' Motion to Compel Selected Documents From Bristol–Myers Squibb Co.'s Privilege Log and Memorandum in Support Thereof, dated February 14, 2002 ("Pl.Waiv.Mot.") at 1. In this motion, plaintiffs point to several instances in which they argue that Bristol–Myers made assertions regarding its intent during the prosecution of the '365 patent. *See* Pl. Waiv. Mot. at 4–9 (and the accompanying exhibits). All of these instances allegedly occurred in the summary judgment briefing in the patent infringement suits (not proceedings in the antitrust actions). They consist generally of Bristol–Myers's statement of its intent not to abandon certain patent claims, Pl. Waiv. Mot. at 5; Bristol–Myers's statement of what it meant by certain language used before the Patent Office, *id.* at 6; Bristol–Myers's statement of its intent regarding what the patent examiner should consider, *id.* at 7–8; and Bristol–Myers's acknowledgment that it worked with outside counsel to draft documents submitted to the patent office and its statement regarding what Bristol–Myers and

its counsel believed should be the construction of their claim, *id.* at 8–9. Plaintiffs argue that Bristol–Myers placed its intent at issue by virtue of these statements and has therefore waived the attorney-client privilege in the antitrust cases. *See* Pl. Waiv. Mot. at 9–15.

■ The elements of the attorney-client privilege are as follows:

(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984) (internal quotation marks omitted). As Bristol–Myers concedes, one instance in which a party waives the attorney-client privilege occurs when the party places otherwise privileged communications "at issue" in the litigation. *See, e.g., In re von Bulow,* 828 F.2d 94, 102 (2d Cir.1987). Communications are "at issue" when the party makes an assertion "that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.) (criminal defendant waived privilege when he asserted that he had a good faith belief that his actions were legal), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *see also United States v. Amlani,* 169 F.3d 1189, 1195 (9th Cir.1999) (attorney-client privilege may be implicitly waived where " 'a party raises a claim which in fairness requires disclosure of the protected communications' ") (citation omitted); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 470 (S.D.N.Y.1996) (party "may waive the privilege if [it] makes factual assertions the truth of which can only be assessed by examination of the privileged communication").

■ The "at issue" waiver doctrine centers on the "fairness" to the party seeking disclosure. It would be unfair for a party

---

**2.** Certain plaintiffs have also brought state law claims for antitrust, unfair competition or unfair

or deceptive trade practices, and unjust enrichment.

who has asserted a factual matter that places attorney-client communications at issue to deprive the opposing party of the means to test that factual matter through discovery of those communications. In this case, however, plaintiffs have no need to discover any of the factual matters allegedly raised by Bristol–Myers because the summary judgment briefing has concluded in the patent infringement cases and the motion has been decided. Thus, even if the Court were to assume that Bristol–Myers had placed its intent at issue during the summary judgment briefing and that discovery of attorney-client communications was necessary to elucidate that intent, Bristol–Myers's intent is no longer "at issue" for purposes of the patent infringement motions and thus cannot be "at issue" in the antitrust suits. Therefore, Bristol–Myers has not obtained some advantage over the antitrust plaintiffs that in fairness must be remedied by allowing the antitrust plaintiffs to take discovery of attorney-client communications relevant to Bristol–Myers's intent.

The generic companies in the patent infringement suits (rather than the antitrust plaintiffs) might have had a claim to the need for discovery of Bristol–Myers's intent if they had sought disclosure to test the validity of the assertions in Bristol–Myers's papers prior to the conclusion of the summary judgment briefing. Instead, the generic companies argued that Bristol–Myers's intent was irrelevant, a proposition with which the Court agreed. *See In re Buspirone Patent Litig.*, 185 F.Supp.2d at 358 ("[i]t is not relevant, in light of these facts, that Bristol–Myers may have desired to maintain coverage of some uses of buspirone or may have argued that the claim language had this scope"). That Bristol–Myers made these assertions regarding its intent during the summary judgment briefing has not given them any advantage over the antitrust plaintiffs because Bristol–Myers's assertions are not being accepted as true in the antitrust suits. Thus, there is no unfairness if the antitrust plaintiffs are unable to take discovery of Bristol–Myers regarding these assertions.

Plaintiffs' argument that "[i]t is black letter law that a party cannot waive its attorney-client privilege as to one set of parties or litigation, and continue to assert the privilege as to other parties or claims," Pl. Waiv. Mot. at 3, misses the point. As the cases cited by plaintiffs themselves indicate, *see GPA, Inc. v. Liggett Group*, 1996 WL 389288, at *4 n. 2 (S.D.N.Y. July 10, 1996); *Drimmer v. Appleton*, 628 F.Supp. 1249, 1252 (S.D.N.Y.1986), this principle deals with the effect of an affirmative disclosure of privileged information. Here, there has been no such disclosure.

Of course, as described in the next section, if Bristol–Myers asserts in the future that it intends to offer its good faith or reliance on advice of counsel during the course of the patent prosecution as defenses to the antitrust actions, it will then have put the relevant communications "at issue" in this case and fairness will dictate that those communications be disclosed. For now at least, Bristol–Myers has not put its communications with counsel regarding the patent prosecution "at issue" and thus has not waived its privilege with respect to those communications. Accordingly, plaintiffs' motion to compel on this ground is denied.

### III. Motion to Require Bristol–Myers to Elect Defenses

On April 16, 2002, plaintiffs filed a motion seeking to compel Bristol–Myers to decide now whether it intends to elect a good faith or reliance on counsel defense. The plaintiffs include within this category "any defense in which [Bristol–Myers] makes affirmative assertions regarding its or its counsel's intent or state-of-mind." Memorandum In Support of Motion to Compel Bristol–Myers Squibb Company To Elect Whether It Intends To Assert "Good Faith" and "Reliance On Counsel" Defenses ("Pl. Elec.Mem.") at 1 n. 2. More specifically, the motion seeks to require Bristol–Myers to state whether it intends to rely on defenses of good faith and reliance on counsel concerning: (1) the agreement between Bristol–Myers and Schein; (2) statements Bristol–Myers made to the FDA; and (3) the prosecution of the patent infringement litigation against the companies seeking to sell generic buspirone. *Id.* at 4. In response, Bristol–Myers acknowledges that it must

ultimately make such an election but argues that it should not be required to do so until 30 days prior to the close of the expert discovery period.

## A. *Appropriateness of Requiring an Election*

As noted, a party waives the attorney-client privilege when its makes an assertion "that in fairness requires examination of protected communications." *Bilzerian,* 926 F.2d at 1292 (2d Cir.1991). "The quintessential example [of "at issue" waiver] is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his privilege with respect to the advice that he received." *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. at 470. Because our rules for civil litigation presume the availability of discovery of all non-privileged factual matters that are relevant to claims or defenses, Fed.R.Civ.P. 26(b)(1), a party must disclose during the discovery period whether it intends to rely on factual assertions or corresponding defenses that would require a waiver of the attorney-client privilege. *See, e.g., Trouble v. Wet Seal, Inc.,* 179 F.Supp.2d 291, 304 (S.D.N.Y.2001) ("[w]hen a party intends to rely at trial on the advice of counsel as a defense to a claim of bad faith, that advice becomes a factual issue, and 'opposing counsel is entitled to know not only whether such an opinion was obtained but also its content and what conduct it advised.'") (quoting *Vicinanzo v. Brunschwig & Fils, Inc.,* 739 F.Supp. 891, 894 (S.D.N.Y.1990)).

In this case, the defendant has given a number of indications that it intends to rely on such factual assertions or defenses both because of issues it raised in response to the prior motion briefing, *see* Section II above, and because of its assertion of certain defenses in one of its Answers. *See* Pl. Elec. Mem. at 4. *See generally Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 993 (9th Cir.1979) (patent infringement actions initiated in bad faith may constitute an attempt to monopolize in violation of Section 2 of the Sherman Act), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). Indeed, Bristol–Myers does not even dispute that it must eventually make the election plaintiffs seek.

It contests only the timing of the election. *See* Memorandum of Bristol–Myers Squibb Company in Opposition to Plaintiff's Motion to Compel Bristol–Myers Squibb Company to Elect Whether it Intends to Assert "Good Faith" and "Reliance on Counsel" Defenses, dated May 21, 2002 ("Bristol–Myers Elec. Mem.") at 3.

## B. *Timing of Election*

■ With respect to the timing of its election, Bristol–Myers concedes, as it must, that "if it intends to rely on 'advice of counsel' as a defense, [it] must allow time for Plaintiffs to explore related evidence." Bristol–Myers Elec. Mem. at 3. The time it proposes for the exploration of such evidence, however, is limited to the final month of expert discovery, which is due to conclude on February 27, 2003. Thus, Bristol–Myers proposes that discovery on the good faith/advice of counsel defenses begin on January 27, 2003 (approximately 7 months from now). *Id.* The plaintiffs counter that Bristol–Myers's election should be made immediately and that discovery commence forthwith.

■ Bristol–Myers argues that it should be able to defer its decision whether to assert good faith or reliance on counsel defenses because some other courts have directed that such discovery take place at the end of or following the conclusion of discovery. Bristol–Myers Elec. Mem. at 3–5. A district court, however, has discretion to make appropriate orders regarding the timing of discovery. *See generally Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir. 1994). Courts are vested with such discretion because each case is different and thus requires consideration of different circumstances in order to ensure that the parties have an opportunity to develop evidence. Thus, that some courts may have confined discovery regarding "advice of counsel" or good faith defenses to the conclusion of the discovery period is of limited precedential value.

Bristol–Myers makes the additional argument that it has "not yet had a fair opportunity to explore critical facts or develop its defenses." Bristol–Myers Elec. Mem. at 5. Bristol–Myers makes this argument, howev-

er, without referring to any discovery it has taken already or had the opportunity to take. In fact, the discovery period available to Bristol–Myers did not commence only recently. Rather, the antitrust actions were filed more than a year ago, were consolidated in this Court in August 2001, and dispositive motions have been filed and decided. Discovery has been ongoing for more than nine months. *See* Reply Memorandum In Support of Motion to Compel Bristol–Myers Squibb Company to Elect Whether It Intends to Assert "Good Faith" and "Reliance on Counsel" Defenses ("Reply Mem.") at 7. The claims that go to the necessity of asserting the defenses obviously have been carefully considered by defense counsel both through the motion to dismiss the antitrust claims as well as the summary judgment briefing in the patent infringement suits. Indeed, these motions required Bristol–Myers to review exhaustively the plaintiffs' claims and to focus on their viability.

Bristol–Myers has also been on notice of plaintiffs' request to make this election since at least March 2002, when plaintiffs wrote to Bristol–Myers's counsel seeking such an election. At the time the instant motion was filed (on April 16, 2002), the deadline for all fact discovery was August 26, 2002. Thus, even under Bristol–Myers's view, it might have been required to make this election as soon as July 26, 2002. It was only after the motion was filed that the discovery period was extended. Fact discovery is now set to conclude on December 12, 2002, less than six months away. In other words, this case has already reached the latter portion of the fact discovery period. All these factors point inevitably to the conclusion that Bristol–Myers has had ample time to consider this case, conduct discovery and decide upon its available defenses. *See generally Baxter Travenol Lab., Inc. v. Abbott Lab.*, 1987 WL 10988, at *1 (N.D.Ill. May 12, 1987) (rejecting argument that defendant should be able to wait until close of discovery period to elect an "advice of counsel" defense where "considerable discovery has been conducted already").

Moreover, as a matter of logic, any factual circumstances that might bear on the choice to assert these defenses are completely within the knowledge of Bristol–Myers and thus are unlikely to be affected by any future discovery that Bristol–Myers intends to conduct. Indeed, Bristol–Myers is uncharacteristically vague with respect to this point, alleging only that it "has not yet had a fair opportunity to explore critical facts or develop its defenses," Bristol–Myers Elec. Mem. at 5, without offering a single specific area on which discovery is required. Without any articulation of the type or method of discovery it requires in order to elect these defenses, its claim to require additional time for this purpose must be rejected.[3]

Of course, Bristol–Myers's failure to explain what discovery is required in order to elect these defenses renders all the more mysterious their assertion that any such discovery should take place at the conclusion of the expert discovery period (February 27, 2003) rather than at the conclusion of the fact discovery period (December 12, 2002). Bristol–Myers surely does not require any discovery of plaintiffs' experts in order to make its election. Indeed, when the plaintiffs initially sought an election from the defendant by letter, defendant's counsel responded in March 2002 that the election should take place "toward the end of *fact* discovery or in a subsequent, contained phase of discovery." Pl. Waiv. Mot., Exhibit D (emphasis added). Thus, even defendant's own suggested time period would not justify the discovery period for their defenses commencing any later than November 12, 2002.

Finally, an important factor in the Court's analysis of when to require the defendant's election is consideration of the prejudice that would inure to the plaintiff. The defenses at issue—if asserted—would be a focus of dis-

---

**3.** The only specific argument that Bristol–Myers has made to support its request to delay the election is that it would like to know the outcome of the pending motion by plaintiffs to pierce the attorney-client privilege under the "crime/fraud" exception to the privilege. *See* Bristol–Myers Elec. Mem. at 6. This motion, however, is logically independent of the instant motion. Because plaintiffs have asserted that an election of defenses may result in the disclosure of the documents sought under "crime/fraud" motion, *see* Pl. Elec. Mem at 2, the latter motion will remain *sub judice* pending Bristol–Myers's decision on election.

pute in this case. Plaintiffs have already noticed the depositions of five attorneys, intend to depose two more and may have to depose at least a dozen or more non-attorney witnesses who had discussions with Bristol–Myers's counsel. *See* Reply Mem. at 6. In addition, there are thousands of pages of documents that have been withheld on the basis of privilege. *See* Letter from Pablo Perhacs to Adam Steinfeld, dated April 26, 2002, reproduced as Reply Mem., Ex. 9 ("approximately 40 boxes of material have been withheld on the basis of privilege"). Plaintiffs should not be required to conduct this discovery in a one-month period.

Bristol–Myers must elect whether it intends to assert good faith and/or advice of counsel defenses expeditiously. Accordingly, the court will permit Bristol–Myers until August 1, 2002 to make the election. The August date comes over a year after these cases were consolidated in this district and allows the plaintiffs approximately four months to conduct discovery relating to these critical defenses. This period results in no demonstrable prejudice to Bristol–Myers, whereas any shorter time would result in prejudice to the plaintiffs or a delay in the resolution of this litigation.

### C. *Scope of Waiver if Elected*

Bristol–Myers argues that if it elects to assert a good faith or "advice of counsel" defense, the scope of the waiver of the attorney-client privilege should be narrowly construed. Bristol–Myers Elec. Mem. at 6–8. Bristol–Myers raises two specific areas that it hopes to exclude from discovery (1) opinions of counsel that were never communicated to the client; and (2) communications and work product made after the commencement of the patent litigation. *Id.* at 7–8.

#### 1. *Opinions of Counsel Not Communicated to the Client*

■ With respect to the work product of outside counsel not disclosed to the client, Bristol–Myers argues that "work product of outside counsel not disclosed to the client should not be included within the scope of the waiver, as it is the client's state of mind that is at issue, not the attorney's." Bristol–

Myers Elec. Mem. at 7. This argument enjoys some support in case law. *See Steelcase Inc. v. Haworth, Inc.*, 954 F.Supp. 1195, 1199–1200 (W.D.Mich.1997) (advice of counsel waiver of the attorney-client privilege "does not extend to attorney work product or documents upon which the attorney relied, unless they were somehow disclosed to [its client]"); *Thorn EMI North America, Inc. v. Micron Tech., Inc.*, 837 F.Supp. at 622 (D.Del.1993) ("[c]ounsel's mental impressions, conclusions, opinions or legal theories are not probative of that state of mind unless they have been communicated to that client"). But in both *Steelcase* and *Thorn*, the courts had concluded that "the 'actual competence' of the [attorney's] opinion was not a matter of consequence" to the issue being litigated. *Steelcase*, 954 F.Supp. at 1199 (quoting *Thorn*, 837 F.Supp. at 621). Here, by contrast, it is not so clear that the "actual competence" of outside counsel's opinions are irrelevant to the case. Bristol–Myers not only had outside counsel but also its own counsel, including an individual who has been identified as Bristol–Myers's inside patent counsel. Unlike a lay person or small corporation that may rely totally on the advice given it by outside counsel, Bristol–Myers had its own attorney to evaluate that advice. Indeed, it was the inside patent counsel who submitted a declaration to the FDA regarding the scope of the '365 patent. If it turned out that the outside counsel's firm held a legal opinion that was at odds with the advice communicated to Bristol–Myers's inside counsel, this opinion should be shared with plaintiffs so, at a minimum, they could probe whether this view had been considered by Bristol–Myers's own counsel. Some cases have specifically noted the relevance of the uncommunicated views of counsel and required their disclosure. *See Equal Employment Opportunity Comm'n v. Rekrem, Inc.*, 2002 WL 27776, at *2 (S.D.N.Y. Jan. 10, 2002) (requiring defendant's attorneys to disclose all materials they relied upon in advising defendant asserting reliance on counsel defense); *Matsushita Elec. Corp. v. Loral Corp.*, 1995 WL 527640, at *2 (S.D.N.Y. Sept. 7, 1995) (because the advice of counsel defense requires that the defen-

dant establish that his reliance on counsel was reasonable, that determination may turn on, among other things, what information was known to the attorney when formulating his or her opinion).

A second consideration also dictates that uncommunicated opinions be disclosed. As a practical matter, communications between outside counsel and a client are rarely if ever exclusively in written form. Thus plaintiffs will inevitably question Bristol–Myers's witnesses regarding their oral discussions with outside counsel on the validity of the patent claim. If documents existed, for example, showing that outside counsel believed at one point that the infringement claims were weak or frivolous, the plaintiffs would have a strong basis for probing the Bristol–Myers witnesses' own knowledge of these views of outside counsel regardless of whether a formal document exists communicating such views. Even if outside counsel's internal discussions end up not being admissible themselves to show Bristol–Myers's intent, the disclosure of such internal discussions would be "reasonably calculated to lead to the discovery of admissible evidence," Fed.R.Civ.P. 26(b)(1). *See Matsushita Elec. Corp. v. Loral Corp.,* 1995 WL 527640, at *1–2 (S.D.N.Y. Sept. 7, 1995) (even though certain materials and information may not have been communicated to client, they are still discoverable because, among other reasons, they may be "quite useful in seeking to unearth the precise substance and scope of the attorney's [oral] advice").[4]

### 2. *Materials Generated Following the Institution of the Patent Infringement Suits*

■ Bristol–Myers contends that it should not be required to provide any materials that were generated "after the filing of the lawsuit," Bristol–Myers Elec. Mem. at 7, apparently a reference to the patent infringement suit, *see id.* ("attorney work product and communications after the commencement of the patent infringement litigation should be

excluded from discovery"). The cases Bristol–Myers cites for this proposition, however, *Carl Zeiss Jena GMBH v. Bio–Rad Lab.,* 2000 WL 1006371 (S.D.N.Y. July 19, 2000) and *Kelsey–Hayes Co. v. Motor Wheel Corp.,* 155 F.R.D. 170 (W.D.Mich.1991), involved waivers where the post-complaint prosecution of the litigation at issue was irrelevant to the subject matter of the waiver.

Here, by contrast, the prosecution of the patent infringement suits is directly relevant to any assertion by Bristol–Myers that its use of the Hatch–Waxman provisions was in good faith. The filing of the patent infringement suits merely began the process of obtaining for Bristol–Myers the 30–month stay that prevented the generic companies from selling buspirone. It was not sufficient, however, for Bristol–Myers merely to file the patent infringement suits in order to enjoy the 30–month stay. To maintain the stay, Bristol–Myers had to actively litigate the case or else the stay could be terminated through an order of the court. 21 U.S.C. § 355(j)(5)(B)(iii). Thus, Bristol–Myers was required to respond to Court orders and file papers resisting the generic companies' motion for summary judgment. To merely have filed the complaints and failed to prosecute them would assuredly have resulted in a termination of the stay. Moreover, each day that passed with the stay in effect inured to the benefit of Bristol–Myers because it meant an additional day when Bristol–Myers could sell buspirone but the generic companies could not. The necessity for discovery of what occurred in the post-filing period may be demonstrated by supposing that Bristol–Myers had come to the conclusion during the prosecution of the infringement suits that their position was in fact baseless. The antitrust plaintiffs would be entitled to discovery of this fact in the face of any contention by Bristol–Myers that it acted in good faith in obtaining the benefits of the Hatch–Waxman stay provision.

---

4. Bristol–Myers argues that in no event should its "post-complaint trial strategy" be disclosed. The Court is unable to rule on the relevance of "trial strategy" because this broad phrase is susceptible to many meanings. Obviously, discovery of the undisclosed documents of outside counsel should be limited to matters placed at issue by Bristol–Myers's election of defenses. The parties may make an application to the Court in the event there are any disputes in the future regarding the scope of disclosure.

In sum, to the extent that Bristol–Myers chooses to rely on its good faith or advice of counsel in justifying its intent or state of mind in pursuing the patent infringement suits, it will put at issue its intent not only at the time of the filing but also during the prosecution of the suits.

## IV. CONCLUSION

The motion to require Bristol–Myers to elect whether to assert a good faith and/or reliance on counsel defense is granted. Bristol–Myers is directed to state its intention to the plaintiffs in writing on or before August 1, 2002. Starting immediately, Bristol–Myers shall begin preparing for inspection and copying any documents responsive to document requests that Bristol–Myers would be required to produce under this order should Bristol–Myers elect on August 1 to rely on such defenses. In the event Bristol–Myers elects to assert these defenses, it is directed to produce the responsive documents on August 1, 2002.

SO ORDERED.